# Supreme Court of Florida

_____

No. SC13-2006

_____

**ADVISORY OPINION TO THE ATTORNEY GENERAL RE: USE OF MARIJUANA FOR CERTAIN MEDICAL CONDITIONS.**

_____

No. SC13-2132

_____

**ADVISORY OPINION TO THE ATTORNEY GENERAL RE: USE OF MARIJUANA FOR CERTAIN MEDICAL CONDITIONS (FINANCIAL IMPACT STATEMENT).**

[January 27, 2014]

PER CURIAM.

The Attorney General of Florida has petitioned this Court for an advisory opinion as to the validity of a proposed citizen initiative amendment to the Florida Constitution, submitted by an organization called People United for Medical Marijuana (the "proponent"), and the corresponding Financial Impact Statement submitted by the Financial Impact Estimating Conference. We have jurisdiction. See art. IV, § 10; art. V, § 3(b)(10), Fla. Const.

Our review of the proposed amendment is confined to two issues: (1) whether the proposed amendment itself satisfies the single-subject requirement of article XI, section 3, of the Florida Constitution; and (2) whether the ballot title and summary satisfy the requirements of section 101.161(1), Florida Statutes (2013). See Advisory Op. to Att'y Gen. re Water & Land Conservation—Dedicates Funds to Acquire & Restore Fla. Conservation & Recreation Lands, 123 So. 3d 47, 50 (Fla. 2013). For the reasons we explain, we conclude that the proposed amendment embraces a single subject, which is the medical use of marijuana, and therefore complies with article XI, section 3.

We also conclude that the ballot title and summary comply with section 101.161(1) because they are not clearly and conclusively defective. By reading the proposed amendment as a whole and construing the ballot title together with the ballot summary, we hold that the voters are given fair notice as to the chief purpose and scope of the proposed amendment, which is to allow a restricted use of marijuana for certain "debilitating" medical conditions. We conclude that the voters will not be affirmatively misled regarding the purpose of the proposed amendment because the ballot title and summary accurately convey the limited use of marijuana, as determined by a licensed Florida physician, that would be authorized by the amendment consistent with its intent. The interpretation of the proposed amendment offered by the proponent that "the intent is to allow

[marijuana] use for a serious medical condition or disease," rather than for any medical condition for which a physician personally believes that the benefits outweigh the health risks, is a reasonable one that is supported by accepted principles of constitutional interpretation.

Finally, we conclude that the accompanying Financial Impact Statement is in compliance with section 100.371(5), Florida Statutes (2013). We therefore approve the proposed amendment and Financial Impact Statement for placement on the ballot. We express no opinion as to the merits of the proposal.

## I. BACKGROUND

On October 24, 2013, the Attorney General petitioned this Court for an opinion as to the validity of a citizen initiative petition sponsored by the proponent and circulated pursuant to article XI, section 3, of the Florida Constitution. The proposed amendment would add a new section 29 to article X of the Florida Constitution. The full text of the proposed amendment states as follows:

ARTICLE X, SECTION 29. Medical marijuana production, possession and use.—
(a) PUBLIC POLICY.
(1) The medical use of marijuana by a qualifying patient or personal caregiver is not subject to criminal or civil liability or sanctions under Florida law except as provided in this section.
(2) A physician licensed in Florida shall not be subject to criminal or civil liability or sanctions under Florida law for issuing a physician certification to a person diagnosed with a debilitating medical condition in a manner consistent with this section.
(3) Actions and conduct by a medical marijuana treatment center registered with the Department, or its employees, as permitted

by this section and in compliance with Department regulations, shall not be subject to criminal or civil liability or sanctions under Florida law except as provided in this section.

(b) DEFINITIONS. For purposes of this section, the following words and terms shall have the following meanings:

(1) "Debilitating Medical Condition" means cancer, glaucoma, positive status for human immunodeficiency virus (HIV), acquired immune deficiency syndrome (AIDS), hepatitis C, amyotrophic lateral sclerosis (ALS), Crohn's disease, Parkinson's disease, multiple sclerosis or other conditions for which a physician believes that the medical use of marijuana would likely outweigh the potential health risks for a patient.

(2) "Department" means the Department of Health or its successor agency.

(3) "Identification card" means a document issued by the Department that identifies a person who has a physician certification or a personal caregiver who is at least twenty-one (21) years old and has agreed to assist with a qualifying patient's medical use of marijuana.

(4) "Marijuana" has the meaning given cannabis in Section 893.02(3), Florida Statutes (2013).

(5) "Medical Marijuana Treatment Center" means an entity that acquires, cultivates, possesses, processes (including development of related products such as food, tinctures, aerosols, oils, or ointments), transfers, transports, sells, distributes, dispenses, or administers marijuana, products containing marijuana, related supplies, or educational materials to qualifying patients or their personal caregivers and is registered by the Department.

(6) "Medical use" means the acquisition, possession, use, delivery, transfer, or administration of marijuana or related supplies by a qualifying patient or personal caregiver for use by a qualifying patient for the treatment of a debilitating medical condition.

(7) "Personal caregiver" means a person who is at least twenty-one (21) years old who has agreed to assist with a qualifying patient's medical use of marijuana and has a caregiver identification card issued by the Department. A personal caregiver may assist no more than five (5) qualifying patients at one time. An employee of a hospice provider, nursing, or medical facility may serve as a personal caregiver to more than five (5) qualifying patients as permitted by the Department. Personal caregivers are prohibited from consuming

marijuana obtained for the personal, medical use by the qualifying patient.

(8) "Physician" means a physician who is licensed in Florida.

(9) "Physician certification" means a written document signed by a physician, stating that in the physician's professional opinion, the patient suffers from a debilitating medical condition, that the potential benefits of the medical use of marijuana would likely outweigh the health risks for the patient, and for how long the physician recommends the medical use of marijuana for the patient. A physician certification may only be provided after the physician has conducted a physical examination of the patient and a full assessment of the patient's medical history.

(10) "Qualifying patient" means a person who has been diagnosed to have a debilitating medical condition, who has a physician certification and a valid qualifying patient identification card. If the Department does not begin issuing identification cards within nine (9) months after the effective date of this section, then a valid physician certification will serve as a patient identification card in order to allow a person to become a "qualifying patient" until the Department begins issuing identification cards.

(c) LIMITATIONS.

(1) Nothing in this section shall affect laws relating to non-medical use, possession, production or sale of marijuana.

(2) Nothing in this section authorizes the use of medical marijuana by anyone other than a qualifying patient.

(3) Nothing in this section allows the operation of a motor vehicle, boat, or aircraft while under the influence of marijuana.

(4) Nothing in this law section [sic] requires the violation of federal law or purports to give immunity under federal law.

(5) Nothing in this section shall require any accommodation of any on-site medical use of marijuana in any place of education or employment, or of smoking medical marijuana in any public place.

(6) Nothing in this section shall require any health insurance provider or any government agency or authority to reimburse any person for expenses related to the medical use of marijuana.

(d) DUTIES OF THE DEPARTMENT. The Department shall issue reasonable regulations necessary for the implementation and enforcement of this section. The purpose of the regulations is to ensure the availability and safe use of medical marijuana by

qualifying patients.  It is the duty of the Department to promulgate regulations in a timely fashion.

(1)  Implementing Regulations.  In order to allow the Department sufficient time after passage of this section, the following regulations shall be promulgated no later than six (6) months after the effective date of this section:

a.  Procedures for the issuance of qualifying patient identification cards to people with physician certifications, and standards for the renewal of such identification cards.

b.  Procedures for the issuance of personal caregiver identification cards to persons qualified to assist with a qualifying patient's medical use of marijuana, and standards for the renewal of such identification cards.

c.  Procedures for the registration of Medical Marijuana Treatment Centers that include procedures for the issuance, renewal, suspension, and revocation of registration, and standards to ensure security, record keeping, testing, labeling, inspection, and safety.

d.  A regulation that defines the amount of marijuana that could reasonably be presumed to be an adequate supply for qualifying patients' medical use, based on the best available evidence.  This presumption as to quantity may be overcome with evidence of a particular qualifying patient's appropriate medical use.

(2)  Issuance of identification cards and registrations.  The Department shall begin issuing qualifying patient and personal caregiver identification cards, as well as begin registering Medical Marijuana Treatment Centers no later than nine months (9) after the effective date of this section.

(3)  If the Department does not issue regulations, or if the Department does not begin issuing identification cards and registering Medical Marijuana Treatment Centers within the time limits set in this section, any Florida citizen shall have standing to seek judicial relief to compel compliance with the Department's constitutional duties.

(4)  The Department shall protect the confidentiality of all qualifying patients.  All records containing the identity of qualifying patients shall be confidential and kept from public disclosure other than for valid medical or law enforcement purposes.

(e) LEGISLATION. Nothing in this section shall limit the legislature from enacting laws consistent with this provision.

(f) SEVERABILITY. The provisions of this section are severable and if any clause, sentence, paragraph or section of this measure, or an application thereof, is adjudged invalid by any court of competent jurisdiction other provisions shall continue to be in effect to the fullest extent possible.

The ballot title for the proposed amendment is "Use of Marijuana for Certain Medical Conditions," and the ballot summary, which is limited by law to seventy-five words, reads as follows:

Allows the medical use of marijuana for individuals with debilitating diseases as determined by a licensed Florida physician. Allows caregivers to assist patients' medical use of marijuana. The Department of Health shall register and regulate centers that produce and distribute marijuana for medical purposes and shall issue identification cards to patients and caregivers. Applies only to Florida law. Does not authorize violations of federal law or any non-medical use, possession or production of marijuana.

On November 4, 2013, the Financial Impact Estimating Conference forwarded to the Attorney General the following Financial Impact Statement regarding the proposed amendment:

Increased costs from this amendment to state and local governments cannot be determined. There will be additional regulatory and enforcement activities associated with the production and sale of medical marijuana. Fees will offset at least a portion of the regulatory costs. While sales tax may apply to purchases, changes in revenue cannot reasonably be determined since the extent to which medical marijuana will be exempt from taxation is unclear without legislative or state administrative action.

Following this Court's direction for interested parties to file briefs as to the Attorney General's petition, the proponent submitted a brief in support of the proposed amendment's validity, while the Court received four briefs in opposition, filed by the Attorney General; the Florida Senate and Florida House of Representatives; the Florida Chamber of Commerce, Florida Medical Association, Florida Police Chiefs Association, Florida Sheriffs Association, and Save Our Society from Drugs; and a pro se citizen (collectively, the "opponents"). No briefs or comments were submitted to this Court in response to the proponent's argument that the Financial Impact Statement complies with section 100.371(5), Florida Statutes.

## II. STANDARD OF REVIEW

This Court has traditionally applied a deferential standard of review to the validity of a citizen initiative petition and "has been reluctant to interfere" with "the right of self-determination for <u>all</u> Florida's citizens" to formulate "their own organic law." <u>Advisory Op. to Att'y Gen. re Right to Treatment & Rehab. for Non-Violent Drug Offenses</u>, 818 So. 2d 491, 494 (Fla. 2002). As this Court has stated:

> There is no lawful reason why the electors of this State should not have the right to determine the manner in which the Constitution may be amended. This is the most sanctified area in which a court can exercise power. Sovereignty resides in the people and the electors have a right to approve or reject a proposed amendment to the organic law of this State, limited only by those instances where there is an

entire failure to comply with a plain and essential requirement of [the law].

Id. (quoting Pope v. Gray, 104 So. 2d 841, 842 (Fla. 1958)). In this vein, this Court has long explained that our "duty is to uphold the proposal unless it can be shown to be 'clearly and conclusively defective.' " In re Advisory Op. to Att'y Gen. re Fla.'s Amend. to Reduce Class Size, 816 So. 2d 580, 582 (Fla. 2002) (quoting Advisory Op. to Att'y Gen. re Tax Limitation, 673 So. 2d 864, 867 (Fla. 1996)); see also In re Advisory Op. to Att'y Gen. re Med. Liab. Claimant's Comp. Amend., 880 So. 2d 675, 676 (Fla. 2004) ("In order for the Court to invalidate a proposed amendment, the record must show that the proposal is clearly and conclusively defective . . . ." (quoting Advisory Op. to Att'y Gen. re Amend. to Bar Gov't from Treating People Differently Based on Race in Pub. Educ., 778 So. 2d 888, 891 (Fla. 2000))).

When determining the validity of an amendment arising through the citizen initiative process, our inquiry is limited to two legal issues: (1) whether the proposed amendment violates the single-subject requirement of article XI, section 3, of the Florida Constitution; and (2) whether the ballot title and summary violate the requirements of section 101.161(1), Florida Statutes. Right to Treatment & Rehab., 818 So. 2d at 494. We do not address the merits of the proposal. Id.

We begin our analysis in this case with the single-subject requirement.

### III.  SINGLE-SUBJECT REQUIREMENT

Article XI, section 3, of the Florida Constitution sets forth the requirements for a proposed constitutional amendment arising through the citizen initiative process. This constitutional provision provides in pertinent part that any proposed citizen initiative amendment "shall embrace but one subject and matter directly connected therewith." Art. XI, § 3, Fla. Const. "In evaluating whether a proposed amendment violates the single-subject requirement, the Court must determine whether it has a 'logical and natural oneness of purpose.' " Treating People Differently, 778 So. 2d at 891-92 (quoting Fine v. Firestone, 448 So. 2d 984, 990 (Fla. 1984)).

The single-subject requirement "is a rule of restraint designed to insulate Florida's organic law from precipitous and cataclysmic change." In re Advisory Op. to Att'y Gen.—Save Our Everglades, 636 So. 2d 1336, 1339 (Fla. 1994). This requirement prevents a proposal "from engaging in either of two practices: (a) logrolling; or (b) substantially altering or performing the functions of multiple branches of state government." Water & Land Conservation, 123 So. 3d at 50-51.

This Court has defined logrolling as "a practice wherein several separate issues are rolled into a single initiative in order to aggregate votes or secure approval of an otherwise unpopular issue." Save Our Everglades, 636 So. 2d at 1339. This Court has also explained that "[a] proposal that affects several branches of government will not automatically fail; rather, it is when a proposal

- 10 -

substantially alters or performs the functions of multiple branches that it violates the single-subject test." Advisory Op. to Att'y Gen. re Fish & Wildlife Conservation Comm'n, 705 So. 2d 1351, 1353-54 (Fla. 1998).

The opponents, including the Attorney General and the Legislature, allege that the proposed amendment violates the single-subject requirement for a variety of reasons, including that the amendment engages in impermissible logrolling by combining separate subjects into one proposal, and that the amendment substantially alters multiple functions of government by making broad legislative policy determinations; exercising executive authority through "constitutionalizing" the Department of Health and establishing a complex regulatory system; and providing physicians broad immunity, thereby affecting access to courts. We disagree.

We conclude that the proposed amendment has a logical and natural oneness of purpose—namely, whether Floridians want a provision in the state constitution authorizing the medical use of marijuana, as determined by a licensed Florida physician, under Florida law. The amendment's provision of a specific role for the Department of Health in overseeing and licensing the medical use of marijuana is directly connected with this purpose. See Advisory Op. to Att'y Gen.—Fee on Everglades Sugar Prod., 681 So. 2d 1124, 1128 (Fla. 1996) (concluding that the proposal did not violate the single-subject requirement and explaining that "the

imposition of the fee and the designation of the revenue . . . are two components directly connected to the fundamental policy of requiring first processors to contribute towards ongoing Everglades restoration"). As this Court explained in Advisory Opinion to the Attorney General re Standards for Establishing Legislative District Boundaries, 2 So. 3d 175 (Fla. 2009), a proposed amendment may "delineate a number of guidelines" consistent with the single-subject requirement as long as these components possess "a natural relation and connection as component parts or aspects of a single dominant plan or scheme." Id. at 181-82 (quoting Advisory Op. to Att'y Gen. re Patients' Right to Know About Adverse Med. Incidents, 880 So. 2d 617, 620 (Fla. 2004)).

Further, removing state-imposed penalties and liability from those involved in the authorized medical use of marijuana consistent with the proposed amendment is also directly connected with the amendment's purpose. Therefore, the proposed amendment does not engage in impermissible logrolling, but is instead consistent with prior proposals this Court has approved "because they encompassed a single plan and merely enumerated various elements necessary to accomplish that plan." Id. at 182; see also Advisory Op. to Att'y Gen. re. Fla. Transp. Initiative for Statewide High Speed Monorail, Fixed Guideway or Magnetic Levitation Sys., 769 So. 2d 367, 369 (Fla. 2000) (holding that "there is no impermissible logrolling" where "[t]he only subject embraced in the proposed

amendment is whether the people of this State want to include a provision in their Constitution mandating that the government build a high speed ground transportation system").

Additionally, the proposed amendment does not substantially alter or perform the functions of multiple branches. If the amendment passes, the Department of Health would perform regulatory oversight, which would not substantially alter its function or have a substantial impact on legislative functions or powers. The amendment would require the Department of Health or its successor agency to register and oversee providers, issue identification cards, and determine treatment amounts to ensure the "safe use of medical marijuana by qualifying patients." See Everglades Sugar Prod., 681 So. 2d at 1128 ("[T]he Fee amendment does not substantially affect or alter any government function, but is a levy by an existing agency."); see also Advisory Op. to Att'y Gen. re Term Limits Pledge, 718 So. 2d 798, 802 (Fla. 1998) (concluding that the initiative did not substantially alter the functions of multiple branches "even though affecting the constitutional authority of the Secretary of State and affecting more than one provision of the constitution").

"[T]he fact that [a] branch of government is required to comply with a provision of the Florida Constitution does not necessarily constitute the usurpation of the branch's function within the meaning of the single-subject rule." Advisory

- 13 -

Op. to Att'y Gen. re Protect People, Especially Youth, From Addiction, Disease, and Other Health Hazards of Using Tobacco, 926 So. 2d 1186, 1192 (Fla. 2006). Moreover, the Department of Health would not be empowered under this amendment to make the types of primary policy decisions that are prohibited under the doctrine of nondelegation of legislative power. See Askew v. Cross Key Waterways, 372 So. 2d 913, 925 (Fla. 1978).

Accordingly, we conclude that the proposed amendment complies with the single-subject requirement of article XI, section 3.

## IV. BALLOT TITLE AND SUMMARY

The next issue we address is whether the proposed amendment will be "accurately represented on the ballot." Armstrong v. Harris, 773 So. 2d 7, 12 (Fla. 2000) (emphasis omitted). This requires us to consider two questions: (1) whether the ballot title and summary, in clear and unambiguous language, fairly inform the voters of the chief purpose of the amendment; and (2) whether the language of the ballot title and summary, as written, will be affirmatively misleading to voters. See Advisory Op. to Att'y Gen. re Fla. Marriage Prot. Amend., 926 So. 2d 1229, 1236 (Fla. 2006).

We conclude that the ballot title and summary fairly inform voters of the chief purpose of the amendment and will not mislead voters, who will be able to cast an intelligent and informed ballot as to whether they want a provision in the

- 14 -

state constitution authorizing the medical use of marijuana, as determined by a licensed Florida physician, under Florida law. We therefore reject the opponents' assertion that the amendment "would allow far wider marijuana use than the ballot title and summary reveal."

Section 101.161, Florida Statutes, governs the requirements for the ballot title and summary of an initiative petition. This statute provides in pertinent part as follows:

> (1) Whenever a constitutional amendment or other public measure is submitted to the vote of the people, a ballot summary of such amendment or other public measure shall be printed in clear and unambiguous language on the ballot after the list of candidates, followed by the word "yes" and also by the word "no," and shall be styled in such a manner that a "yes" vote will indicate approval of the proposal and a "no" vote will indicate rejection. The ballot summary of the amendment or other public measure and the ballot title to appear on the ballot shall be embodied in the constitutional revision commission proposal, constitutional convention proposal, taxation and budget reform commission proposal, or enabling resolution or ordinance. The ballot summary of the amendment or other public measure shall be an explanatory statement, not exceeding 75 words in length, of the chief purpose of the measure. In addition, for every amendment proposed by initiative, the ballot shall include, following the ballot summary, a separate financial impact statement concerning the measure prepared by the Financial Impact Estimating Conference in accordance with s. 100.371(5). The ballot title shall consist of a caption, not exceeding 15 words in length, by which the measure is commonly referred to or spoken of. This subsection does not apply to constitutional amendments or revisions proposed by joint resolution.

§ 101.161(1), Fla. Stat. (2013).

In <u>Save Our Everglades</u>, this Court explained the meaning of section 101.161 in the following way:

> "[S]ection 101.161 requires that the ballot title and summary for a proposed constitutional amendment state in clear and unambiguous language the chief purpose of the measure." This is so that the voter will have notice of the issue contained in the amendment, will not be misled as to its purpose, and can cast an intelligent and informed ballot. However, "[i]t is not necessary to explain every ramification of a proposed amendment, only the chief purpose."

636 So. 2d at 1341 (citations omitted). "In brief, the ballot title and summary must fairly inform the voter of the chief purpose of the amendment." <u>Right to Treatment & Rehab.</u>, 818 So. 2d at 497.

The opponents and Chief Justice Polston's dissent, agreeing with the arguments of the opponents, allege multiple reasons why the ballot title and summary are affirmatively misleading. Taken together, the main arguments of the opponents and the Chief Justice's dissent are that: (1) the summary "promises a narrow and limited marijuana program—the precise opposite of what the [a]mendment would deliver"; (2) the summary fails to disclose that physicians who authorize patients' use of medical marijuana consistent with the amendment allegedly will receive broad tort and disciplinary immunity; and (3) the summary wrongly suggests that the amendment "allows" activities that are plainly illegal under federal law. We address each of these arguments in turn.

**A.  The Scope of the Amendment**

We begin with the opponents' first and primary assertion: that the ballot title and summary hide the true scope of the proposed amendment. Specifically, we address two arguments raised by the opponents and contained in the dissents of Chief Justice Polston and Justice Labarga: (1) that the ballot summary is misleading because the phrase "debilitating diseases" will lead voters to think that the conditions that would qualify for the medical use of marijuana are only very serious ones, when in fact the amendment would permit virtually "limitless" use of marijuana; and (2) that the ballot title and summary are misleading based on the inconsistent use of terms such as "certain" in the title and "diseases" in the summary that will lead voters to believe that the amendment is narrow in scope, when in actuality it would authorize marijuana use for any condition for which a physician believes that the benefits outweigh the risks. To further illustrate this contention as to the "limitless" scope of the proposed amendment, Chief Justice Polston asserts that under the amendment, medical marijuana could be prescribed for "anxiety about an upcoming exam" or "minor aches and pains." Dissenting op. at 50, 55 (Polston, C.J.).

The opponents and Chief Justice Polston's dissent contend that the proponent deceptively uses the phrases "debilitating diseases" and "certain medical conditions" in the ballot title and summary in an attempt to gain an electoral advantage with voters who might otherwise object to a broader use of medical

- 17 -

marijuana. The proponent counters that the intent of the amendment and the actual wording of the amendment, when various portions are read together, is not to authorize the open-ended and broad use of marijuana whenever a physician personally believes that the benefits outweigh the risks.

To the contrary, the proponent contends that the opponents advance a flawed interpretation of the proposed amendment as being "limitless" in scope and assert that marijuana can be prescribed by a physician only after the physician performs a physical examination, reviews the patient's medical history and finds that the patient has a "debilitating" medical condition, concludes that the potential benefits of using medical marijuana would likely outweigh the health risks, and then allows a limited time for any qualifying use. The proponent states that the "intent is to allow use for a serious medical condition or disease."

Because the proponent and opponents disagree as to the scope of the proposed amendment, and because in our view the question of whether the ballot title and summary are misleading on this point turns on the interpretation of the amendment itself, we must review the operative portions of the proposed amendment's text. "When reviewing constitutional provisions, this Court follows principles parallel to those of statutory interpretation." Graham v. Haridopolos, 108 So. 3d 597, 603 (Fla. 2013) (quoting Crist v. Fla. Ass'n of Criminal Def. Lawyers, Inc., 978 So. 2d 134, 139 (Fla. 2008)).

- 18 -

# 1. "Debilitating Medical Condition"

The initial argument we address concerns the breadth of the phrase

"debilitating medical condition" in the text of the proposed amendment.  There are

three pertinent sections of the amendment related to this issue.

First, subsection (b)(1) defines the term "Debilitating Medical Condition" to

mean:

> cancer, glaucoma, positive status for human immunodeficiency virus
> (HIV), acquired immune deficiency syndrome (AIDS), hepatitis C,
> amyotrophic lateral sclerosis (ALS), Crohn's disease, Parkinson's
> disease, multiple sclerosis or other conditions for which a physician
> believes that the medical use of marijuana would likely outweigh the
> potential health risks for a patient.

Second, subsection (b)(9) defines the term "Physician Certification"

to mean:

> a written document signed by a physician, stating that in the
> physician's professional opinion, the patient suffers from a
> debilitating medical condition, that the potential benefits of the
> medical use of marijuana would likely outweigh the health risks for
> the patient, and for how long the physician recommends the medical
> use of marijuana for the patient.  A physician certification may only
> be provided after the physician has conducted a physical examination
> of the patient and a full assessment of the patient's medical history.

Finally, subsection (b)(10) defines the term "Qualifying patient" to

mean "a person who has been diagnosed to have a debilitating medical

condition, who has a physician certification and a valid qualifying patient

identification card."

The opponents claim that, contrary to the impression presented by the ballot title and summary, these provisions in the proposed amendment's text authorize the medical use of marijuana for more conditions than are commonly thought of as "debilitating," and would allow physicians unfettered authority to authorize the use of marijuana for conditions ranging from everyday aches and pains to everyday stresses. In support of their argument about the breadth of the proposed amendment, the opponents point to the portion of subsection (b)(1) that includes, within the definition of "debilitating medical condition," the phrase "other conditions for which a physician believes that the medical use of marijuana would likely outweigh the potential health risks for a patient."

The proponent responds that the term "debilitating medical condition," as defined in the text of the proposed amendment, includes specific and known debilitating conditions such as cancer and ALS but simply cannot and "does not attempt to define all possible debilitating conditions" for now and the future. The proponent contends that the "other conditions determined by a physician must be generically similar in severity or seriousness to the specific list of medical conditions" set forth in the proposed amendment.

The proponent further asserts that the types of conditions for which the proposed amendment authorizes the medical use of marijuana are limited by the requirement of "physician certification," which mandates that a physician certify in

writing that the patient suffers from a "debilitating" condition and that the benefits of medical marijuana usage outweigh the health risks to the patient. In other words, the proponent states that the ballot title and summary are not misleading precisely because the intent of the amendment is to limit the use of marijuana to "debilitating medical conditions" and not to a broad and open-ended range of more minor medical conditions.

We reject the opponents' construction of the proposed amendment. Instead, for the reasons that follow, we conclude that the interpretation offered by the proponent is a reasonable one that is supported by accepted principles of constitutional interpretation.

In order to determine the scope of the proposed amendment, we begin by defining the key term "debilitating," which is the term used in both the amendment itself and the ballot summary to describe the types of conditions for which the amendment would authorize the medical use of marijuana. Notably, although "debilitating" is the key term that defines the breadth of the proposed amendment because it restricts the "medical conditions" that fall within the amendment's scope, Chief Justice Polston's dissent finds this critical term to be insignificant, focusing instead on the differences that exist between the terms "condition" in the ballot title and text of the proposed amendment and "disease" in the ballot summary, while minimizing the impact of the "debilitating" modifier used in both

the proposed amendment and the ballot summary. To the contrary, we conclude that an analysis of the term "debilitating" is critical to understanding the intended scope of the proposed amendment, as a patient does not qualify under the text of the proposed amendment to receive a physician certification unless a licensed Florida physician makes a professional determination that the medical condition is "debilitating."

In construing terms used in the constitution and presented to the voters in a proposed constitutional amendment, this Court looks to dictionary definitions of the terms because we recognize that, "in general, a dictionary may provide the popular and common-sense meaning of terms presented to the voters." Advisory Op. to Gov.–1996 Amend. 5 (Everglades), 706 So. 2d 278, 282 (Fla. 1997). Merriam Webster's Collegiate Dictionary defines "debilitating" to mean "to impair the strength of; enfeeble." Merriam-Webster's Collegiate Dictionary 320 (11th ed. 2005). The Oxford English Dictionary likewise defines "debilitating" to mean "[t]hat debilitates; weakening, enfeebling," where "debilitate" is defined as "[t]o render weak; to weaken, enfeeble." The Oxford English Dictionary 312 (2d ed. 1989). Similarly, Stedman's Medical Dictionary defines "debilitating" as "[d]enoting or characteristic of a morbid process that causes weakness," where "morbid" is defined as "[d]iseased or pathologic." Stedman's Medical Dictionary 496, 1226 (28th ed. 2006).

- 22 -

The common definition of "debilitating," based on these authorities, is therefore similar under both medical and lay dictionaries. While the opponents suggest that the proposed amendment would authorize the "unfettered" use of marijuana to treat more conditions than are commonly thought of as "debilitating," the popular and common-sense meaning of "debilitating"—though not requiring the condition to be as "serious and devastating" as the opponents state—still requires that the medical condition cause impaired strength, weakness, or enfeeblement. In other words, a physician must first make a professional determination that the patient's medical condition causes impaired strength, weakness, or enfeeblement in order to consider issuing a physician certification consistent with the proposed amendment, which limits the amendment's scope.

Nevertheless, the opponents contend that the proposed amendment does not even require that an individual's condition be "debilitating." In arguing that the proposed amendment is virtually "limitless," the opponents point to the portion of the definition of "debilitating medical condition" within the proposed amendment that includes the phrase "other conditions for which a physician believes that the medical use of marijuana would likely outweigh the potential health risks for a patient."

This phrase, however, is found within the section of the proposed amendment that defines "<u>debilitating</u> medical condition." (Emphasis added.) In

this regard, we conclude that the phrase cannot be read in isolation to include any medical condition in which the physician concludes that the benefits of marijuana use outweigh the health risks, regardless of the "debilitating" nature of the condition. Instead, in order for a physician to prescribe marijuana to treat a medical condition not specifically listed in the amendment, the physician still must make a professional determination that the condition is "debilitating."

Further and importantly, the statutory and constitutional construction principle of ejusdem generis—which is a Latin term for "of the same kind"—is instructive on this issue. Distilled to its essence, this rule provides that where general words or phrases follow an enumeration of specific words or phrases, "the general words are construed as applying to the same kind or class as those that are specifically mentioned." Fayad v. Clarendon Nat'l Ins. Co., 899 So. 2d 1082, 1088-89 (Fla. 2005); see also Graham, 108 So. 3d at 605.

Application of ejusdem generis in this case supports our conclusion that the scope of the proposed amendment is not open-ended because the general category of "other conditions" that may qualify as a "debilitating medical condition" under the terms of the amendment must be of the "same kind or class" as those conditions specifically mentioned. In State v. Hearns, 961 So. 2d 211, 219 (Fla. 2007), this Court addressed the meaning of a similar general category that followed a specific list, concluding that the general phrase "any other felony involving the

- 24 -

use or threat of physical force or violence" included "only offenses which involve a level of physical force or violence comparable to that of the enumerated felonies." The Court observed that the mere touching of a law enforcement officer was "not in the same league" as the level of force contemplated by the enumerated felonies in the forcible felony statute. Id.; see also State v. Rivers, 660 So. 2d 1360, 1362 (Fla. 1995) (explaining that the general category of other crimes "dangerous to life, limb, or property, and punishable by imprisonment for more than one year" must be construed "as applying only to crimes of the same kind as those precisely stated in the statute").

Although Chief Justice Polston's and Justice Canady's dissents criticize our use of ejusdem generis, our application of this principle of constitutional interpretation in this case is strikingly similar to its application in Hearns. While Chief Justice Polston's dissent asserts that "the majority rewrites the definition" of "debilitating medical condition" by "in effect insert[ing] the word 'similar' into the clear and unambiguous definition," dissenting op. at 58 (Polston, C.J.), the canon of ejusdem generis itself is predicated upon the concept that a general category following an enumeration of specific words or phrases should be construed "similarly" to those that are specifically mentioned. Thus, the very purpose of ejusdem generis is to assist the Court in interpreting a general category that follows a specific list but that does not include the word "similar." In this way, Chief

Justice Polston's dissent appears to disagree with the interpretive canon itself, as any use of ejusdem generis under the dissent's reasoning would involve inserting the word "similar" into the text.

Moreover, this Court is required to read the term "debilitating medical condition" together with the rest of the proposed amendment. In construing "multiple constitutional provisions addressing a similar subject, the provisions 'must be read in pari materia to ensure a consistent and logical meaning that gives effect to each provision.' " Graham, 108 So. 3d at 603 (quoting Caribbean Conservation Corp. v. Fla. Fish & Wildlife Conservation Comm'n, 838 So. 2d 492, 501 (Fla. 2003)).

In Advisory Opinion to the Attorney General re Florida Locally Approved Gaming, 656 So. 2d 1259, 1262 (Fla. 1995), this Court addressed a similar argument to the one presented by the opponents in this case that the ballot title and summary of a proposed citizen initiative amendment were misleading "because neither inform[ed] the voter of the actual effects of the proposed amendment." This Court rejected that argument, concluding that two subsections of the proposed amendment "must be read together" in order to properly interpret the meaning of the amendment. Id. Moreover, the Court noted that its interpretation, after reading the proposed amendment in pari materia, was "fully consistent with the proponents' construction of the amendment at oral argument." Id.

We conclude that a similar analysis applies in this case. Reading subsections (b)(1), (b)(9), and (b)(10) together demonstrates that the circumstances under which marijuana can be prescribed by a physician are not open-ended to any condition in which the physician personally believes that the benefits outweigh the risks. To the contrary, the circumstances under which the proposed amendment authorizes the medical use of marijuana are limited by two conditions: first, that "in the physician's professional opinion, the patient suffers from a debilitating medical condition"; and second, that "the potential benefits of the medical use of marijuana would likely outweigh the health risks for the patient."

We therefore reject the view expressed in Chief Justice Polston's dissent that "by reading subsections (b)(1) and (b)(9) together, it is abundantly (and redundantly) clear that a physician need only believe that the potential benefits of marijuana would likely outweigh the risks" in order to issue a physician certification. Dissenting op. at 60 (Polston, C.J.). As this Court has consistently explained, "[i]t is an elementary principle of statutory [and constitutional] construction that significance and effect must be given to every word, phrase, sentence, and part" of the provision if possible. Gulfstream Park Racing Ass'n, Inc. v. Tampa Bay Downs, Inc., 948 So. 2d 599, 606 (Fla. 2006) (quoting Hechtman v. Nations Title Ins. of N.Y., 840 So. 2d 993, 996 (Fla. 2003)). The interpretation offered by Chief Justice Polston's dissent, however, would render

- 27 -

meaningless the first part of subsection (b)(9), which states that the physician must determine that "the patient suffers from a debilitating medical condition," since this determination would become unnecessary under the dissent's reasoning given that the second part of subsection (b)(9) already requires a physician to determine that "the potential benefits of the medical use of marijuana would likely outweigh the health risks for the patient."

When the various provisions of the proposed amendment are read together in the context of the entire amendment, it is reasonable to construe the amendment as being limited to "debilitating" medical conditions that require the professional opinion of a physician to diagnose, and that as to each "debilitating" condition, the benefits of prescribing marijuana as a treatment must outweigh the health risks. Further, a "physician certification" must be filed with the Department of Health, affirming that in the physician's professional opinion, the patient suffers from a "debilitating" medical condition; that the potential benefits of the medical use of marijuana would likely outweigh the health risks; and a statement of "how long the physician recommends the medical use of marijuana for the patient."

As to this "physician certification," the amendment also states that it "may only be provided after the physician has conducted a physical examination of the patient and a full assessment of the patient's medical history." The amendment in

addition requires that a "physician certification" must be filed with the Department of Health as to each "qualifying patient."

Rather than allow the open-ended, broad use of marijuana, these multiple restrictions in the text of the amendment itself reflect a constitutional scheme that is meant to be limited in scope regarding the medical use of marijuana to treat "debilitating medical conditions." Indeed, this interpretation is consistent with the interpretation of the proposed amendment offered by the proponent in its brief and at oral argument as to the intent of the amendment as proposed.

### 2. Use of "Certain Medical Conditions" and "Debilitating Diseases"

The opponents' next argument as to the scope of the proposed amendment is that the ballot title and summary are affirmatively misleading because the use of the phrase "certain medical conditions" in the ballot title denotes a fixed number of conditions, and the term "debilitating diseases" used in the ballot summary— instead of "debilitating medical condition," as used in the amendment itself— conveys a more limited scope regarding the use of marijuana than the amendment would actually permit. The proponent, on the other hand, contends that when viewed together, the ballot title and summary accurately convey the chief purpose of the amendment—to authorize the use of marijuana for certain debilitating medical conditions, as determined by a licensed Florida physician, under Florida law.

We agree with the proponent that, read together, the ballot title and summary accurately convey to voters the chief purpose of the proposed amendment. We have previously instructed that when determining whether the ballot title and summary are misleading, it is appropriate to consider both together. See Advisory Op. to Att'y Gen. re Voluntary Universal Pre-Kindergarten Educ., 824 So. 2d 161, 166 (Fla. 2002) ("[T]he ballot title and summary may not be read in isolation, but must be read together in determining whether the ballot information properly informs the voters."); Tax Limitation, 673 So. 2d at 868 (rejecting the Attorney General's argument because "[s]ection 101.161 requires the ballot summary and title to be read together"). This proposition that the ballot title and summary "must be read together in determining whether the ballot information properly informs the voters" has been reaffirmed numerous times, including in Florida Department of State v. Slough, 992 So. 2d 142, 148 (Fla. 2008) (quoting Amendment to Reduce Class Size, 816 So. 2d at 585).

The amendment's ballot title—"Use of Marijuana for Certain Medical Conditions"—supports the proponent's assertion that the voters will not be misled as to the scope of the amendment. Although the opponents contend that the use of "certain" implies that the number of "debilitating" conditions to which the amendment would apply is fixed and definite—while the amendment's actual scope is not—we disagree.

The word "certain" can mean "fixed" or "settled," but a primary dictionary definition of "certain" is also "of a specific but unspecified character, quantity, or degree." Merriam-Webster's Collegiate Dictionary 202 (11th ed. 2005); see also The Oxford English Dictionary 1050-51, (2d ed. 1989) (defining "certain" as both "determined, fixed, settled" and "a restricted or limited number of" or "[o]f positive yet restricted . . . quantity, amount, or degree"). It is therefore necessary to read the ballot title together with the ballot summary, which explains the severity of the conditions that may qualify for the medical use of marijuana and that the qualifying conditions are "determined by a licensed Florida physician." Read together, the use of "certain" in the ballot title conveys to the voters the role of the physician in determining both the necessary severity for a qualifying condition and the medical benefits of marijuana to treat that condition.

The opponents also challenge, and both Chief Justice Polston's and Justice Labarga's dissenting opinions ascribe significance to, the use of the term "diseases" in the ballot summary since this term differs from the term "medical conditions" that is used in the text of the amendment itself. Merriam-Webster's Collegiate Dictionary defines "disease" as "a condition of the living animal or plant body or of one of its parts that impairs normal functioning and is typically manifested by distinguishing signs and symptoms; sickness; malady." Merriam-Webster's Collegiate Dictionary 358 (11th ed. 2005) (emphasis added); see also

- 31 -

Stedman's Medical Dictionary 550 (28th ed. 2006) (defining "disease" as an "interruption, cessation, or disorder of a body, system, or organ structure or function").

The fact that the ballot summary uses the phrase "debilitating diseases" while the text of the amendment uses the phrase "debilitating medical conditions" does not render the ballot summary per se misleading. The "inadvertent use of different but clearly synonymous terms in the proposed amendment and the summary will not render a ballot summary fatally defective where '[t]he differing use of terminology could not reasonably mislead the voters.' " Legislative Dist. Boundaries, 2 So. 3d at 185 (quoting Advisory Op. to Att'y Gen. re English—The Official Language of Fla., 520 So. 2d 11, 13 (Fla. 1988)).

We conclude that the use of "diseases" instead of "conditions" in the ballot summary will not reasonably mislead the voters. A "disease" is, by definition, a medical "condition." See Merriam-Webster's Collegiate Dictionary 358 (11th ed. 2005). Although the opponents and Chief Justice Polston's dissent assert that the word "diseases" was intentionally chosen to deceive voters as to the scope of the amendment "in an attempt to gain electoral advantage with voters who might object to a broader use of medical marijuana," dissenting op. at 56 (Polston, C.J.), it is the modifier "debilitating"—used in both the ballot summary and the amendment itself—that is the key to defining the severity of the conditions for

- 32 -

which the amendment would apply.  Further, the ballot title of the amendment, which must be read together with the ballot summary, uses the term "medical conditions."

This case is therefore distinguishable from other cases in which this Court has held a ballot summary to be misleading because of a discrepancy between the terms used in the ballot summary and the text of the amendment, where the discrepancy was "material and misleading" and where the difference had "legal significance."  Treating People Differently, 778 So. 2d at 896-97.  For example, in In re Advisory Opinion to the Attorney General re Casino Authorization, Taxation & Regulation, 656 So. 2d 466, 468-69 (Fla. 1995), which is relied on by Chief Justice Polston's dissent, this Court invalidated a proposed amendment because "voters were not informed that the proposal's use of different terminology was legally significant."  Treating People Differently, 778 So. 2d at 897.  In that case, the summary used the term "hotel," while the text of the proposed amendment used the term "transient lodging establishment."  Casino Authorization, 656 So. 2d at 468.  This Court found that difference in terminology to be significant because the definitions of "hotel" and "transient lodging establishment" under the Florida Statutes were "substantially different."  Id.  Further, in Treating People Differently, 778 So. 2d 896, also relied on by Chief Justice Polston's dissent, the ballot titles and ballot summaries used the word "people," while the text of the amendments

- 33 -

referred to "persons"—a fact with legal significance not revealed to the voters regarding whether the amendments affected corporations. Id. at 896-97.

Unlike the discrepancies in those cases, there is no legal significance in this case between the use of "debilitating diseases" and "debilitating medical conditions." While Chief Justice Polston points to out-of-state cases that "have acknowledged the differences in meaning between the terms 'condition' and 'disease,' and those differences have determined the outcomes of cases," dissenting op. at 51 (Polston, C.J.), those cases are distinguishable because they have arisen in the insurance context, where other considerations not relevant to our analysis, such as determining when the medical condition began and the scope of insurance coverage, are important to the resolution of a legal dispute.

In contrast to those cases, our inquiry here focuses solely on whether the use of "debilitating diseases" in the ballot summary and "debilitating medical conditions" in the proposed amendment itself will be affirmatively misleading to Florida voters. It is only if the difference between the two terms is "legally significant," and this legal significance is not disclosed to the voters, that the use of different terminology will render the ballot summary affirmatively misleading. Because "debilitating," which is used in both the ballot summary and the text of the proposed amendment itself, is the key to defining the severity of the conditions for which the amendment authorizes the medical use of marijuana, the difference

between the use of "debilitating diseases" in the ballot summary and "debilitating medical conditions" in the amendment itself has no legal significance that is hidden from the voters.

Further, since "disease" is in fact defined as "a condition," the difference in terminology is not "substantially different." As this Court has repeatedly noted, "[t]here is no requirement that the referendum question set forth the [text] verbatim nor explain its complete terms at great and undue length. Such [requirements] would hamper instead of aiding the intelligent exercise of the privilege of voting." Legislative District Boundaries, 2 So. 3d at 185 (quoting Right to Treatment & Rehab., 818 So. 2d at 498). Instead, "[w]hat the law very simply requires is that the ballot give the voter fair notice of the question he must decide so that he may intelligently cast his vote." Id. (quoting Right to Treatment & Rehab., 818 So. 2d at 498).

Here, we conclude that the ballot title and summary, read together, satisfy the legal requirement that the voters be given "fair notice" as to the scope of the proposed amendment. Accordingly, we agree with the proponent that the phrases used in the ballot title and summary "are complementary and explanatory, not misleading" and reject the opponents' arguments as to the allegedly misleading ballot language on the issue of the proposed amendment's scope.

## B. Physician Immunity

- 35 -

We next address the opponents' position that the ballot summary is affirmatively misleading because the proposed constitutional amendment protects doctors who abuse the practice of medicine by prescribing marijuana fraudulently or negligently, but this important aspect of the amendment—that is, physician immunity—is nowhere revealed within the ballot summary. The opponents argue that the immunity from "civil liability or sanctions" would "preclude an injured patient from recovering damages in a civil action against a physician whose wrongful issuance of a physician certification recommending marijuana use resulted in damages to the patient" and the "prohibition against 'sanctions' on a physician would likewise bar the Board of Medicine from initiating a disciplinary action against a physician for recommending marijuana use to patients in a manner contrary to accepted professional standards."

The proponent responds that the text of the proposed amendment provides no such broad immunity but offers protection to physicians only to the extent that they issue a physician certification "in a manner consistent with this section." The proponent asserts that where a physician, whether by fraud or negligence, acts outside of professional standards in diagnosing a patient or prescribing marijuana, this behavior would not be "consistent with this section" and may be subject to professional, civil, or criminal sanctions. Further, the proponent asserts that

statutes governing the practice of medicine would remain in effect if the amendment were to pass and would not be repealed by implication.

In other words, the proponent claims that it is not the intent of the proposed amendment to confer broad immunity, but the opponents claim that this is precisely what the amendment does, therefore rendering the ballot summary fatally defective for omitting this substantial effect. To determine this issue, we once again must examine the text of the amendment as proposed and analyze whether the intent of the proponent was to confer broad immunity, even though the proponent adamantly asserts that there was no such intent.

The text of subsection (a)(2) of the proposed amendment provides in pertinent part as follows:

> A physician licensed in Florida shall not be subject to criminal or civil liability or sanctions under Florida law for issuing a physician certification to a person diagnosed with a debilitating medical condition in a manner consistent with this section.

We agree with the proponent that this subsection does not grant broad immunity for either criminal or civil liability to physicians who prescribe medical marijuana fraudulently or even negligently. Rather, this subsection does no more than what it states—exempts physicians from being subject to criminal or civil liability or sanctions for the limited act of prescribing marijuana in a manner consistent with the amendment. This limited immunity is necessary because, in the absence of such immunity, the mere act of prescribing marijuana, a controlled

substance under Florida law, would result in civil or criminal liability or sanctions, which would prevent the amendment from being implemented. In this regard, the proposed amendment does not protect physicians who fraudulently or negligently prescribe medical marijuana, does not change the professional duties and obligations of licensed Florida physicians, and does not restrict Florida's current constitutional right of access to the courts.

Under the proposed amendment, it is a reasonable construction that physicians are granted immunity only to the extent that they prescribe marijuana "consistent with this section." In other words, if a physician prescribes marijuana without having conducted a physical examination of the patient or without having made a "full assessment of the patient's medical history," and harm to the patient results, this conduct would not be "consistent with this section" and the physician would not be granted immunity.

The immunity subsection allows physicians to prescribe, consistent with the amendment, the medical use of marijuana as a possible treatment option for a "debilitating medical condition" without being criminally or civilly liable or subject to sanctions under Florida law. As the proponent states, in order to enable physicians "to consider medical marijuana and certify its use, it is necessary to prevent them from being punished for the limited act of recommending marijuana

under the terms of the amendment. That is all the amendment does. . . . The amendment does not change liability for negligence, fraud or misconduct."

In addition, nothing in the text of the amendment explicitly repeals existing medical malpractice statutes. This Court has long held that "[i]n considering the effect of constitutional amendments upon existing statutes, the rule is that the statute will continue in effect unless it is completely inconsistent with the plain terms of the Constitution." In re Advisory Op. to Gov., 132 So. 2d 163, 169 (Fla. 1961). It is also settled that "implied repeal of one constitutional provision by another is not favored, and every reasonable effort will be made to give effect to both provisions. Unless the later amendment expressly repeals or purports to modify an existing provision," this Court has explained that "the old and new should stand and operate together unless the clear intent of the later provision is thereby defeated." Legislative Dist. Boundaries, 2 So. 3d at 190 (quoting Jackson v. City of Jacksonville, 225 So. 2d 497, 500-01 (Fla. 1969)). Therefore, as the proposed amendment does not explicitly repeal and is not completely inconsistent with existing medical malpractice or liability statutes, and does not mention the constitutional right of access to courts, we conclude that these provisions would remain in full effect if the amendment were to pass.

As this Court has stated, "a ballot summary need not (and because of the statutory word limit, often cannot) explain 'at great and undue length' the complete

details of a proposed amendment, and some onus falls upon voters to educate themselves about the substance of the proposed amendment." Legislative Dist. Boundaries, 2 So. 3d at 186 (quoting Right to Treatment & Rehab., 818 So. 2d at 498). Because we conclude that this amendment would not alter the liability of physicians for fraudulently or negligently prescribing marijuana, we reject the opponents' assertion that the ballot summary is affirmatively misleading for omitting the issue of liability.

## C. Federal Law

We next address whether the ballot summary will mislead voters regarding the interplay between the proposed amendment and federal law. Specifically, the ballot summary explains that the proposed amendment "[a]pplies only to Florida law" and "[d]oes not authorize violations of federal law." The opponents are certainly correct that these statements, standing alone, do not explicitly inform voters that any use and possession of marijuana, including the medical use of marijuana that would be authorized by the amendment, is currently prohibited by federal law.

However, the statements in the ballot summary are substantially similar in meaning to the proposed amendment's text, which provides that "[n]othing in this law section [sic] requires the violation of federal law or purports to give immunity under federal law." By asserting that the ballot summary should include language

- 40 -

informing the voters that marijuana possession and use is currently prohibited under federal law, the opponents are actually asserting that the ballot summary should include language that is not in the proposed amendment itself. This is not required.

This Court has also never required that a ballot summary inform voters as to the current state of federal law and the impact of a proposed state constitutional amendment on federal statutory law as it exists at this moment in time. Moreover, the statements in the ballot summary are legally accurate. Therefore, the ballot summary's discussion of federal law is not "so misleading as to clearly and conclusively violate section 101.161." Legislative Dist. Boundaries, 2 So. 3d at 187.

## D. Remaining Claims

Finally, the opponents assert that the ballot title and summary are affirmatively misleading because voters are not advised that there will allegedly be no age limit for marijuana use and no requirement that physicians consult parents before authorizing marijuana use for minors; that the definition of "caregiver" is inconsistent with its common meaning and use under the Florida Statutes; and that the ballot summary fails to disclose the amendment's effect on two existing provisions within the Florida Constitution's Declaration of Rights: the right of access to courts and the right of access to public records.

These issues, however, do not involve the chief purpose of the amendment or even a significant effect that would result from the amendment if passed. See § 101.161(1), Fla. Stat. ("The ballot summary of the amendment or other public measure shall be an explanatory statement, not exceeding 75 words in length, of the chief purpose of the measure."). Consequently, these allegations do not warrant striking the proposal from the ballot. See Advisory Op. to Att'y Gen. re Prohibiting Pub. Funding of Political Candidates' Campaigns, 693 So. 2d 972, 975 (Fla. 1997) ("[T]he title and summary need not explain every detail or ramification of the proposed amendment."). Moreover, we note that these allegations are largely speculative and in some instances—such as the right of access to courts—actually inaccurate as to the effect of the proposed amendment.

For all these reasons, we conclude that the ballot title and summary comply with the clarity requirements of section 101.161.

## V. FINANCIAL IMPACT STATEMENT

Although neither the proponent of the amendment nor the opponents assert that the Financial Impact Statement is misleading, this Court still has an independent obligation to review the statement to ensure that it is clear and unambiguous and in compliance with Florida law. See Advisory Op. to Att'y Gen. re Referenda Required for Adoption & Amend. of Local Gov't Comprehensive Land Use Plans, 963 So. 2d 210, 214 (Fla. 2007) (explaining that "the Florida

- 42 -

Constitution mandates that the advisory opinion address the financial impact statement portion of the initiative process"). Article XI, section 5(c), of the Florida Constitution states that "[t]he legislature shall provide by general law, prior to the holding of an election pursuant to this section, for the provision of a statement to the public regarding the probable financial impact of any amendment proposed by initiative pursuant to [article XI,] section 3." Section 100.371(5)(a), Florida Statutes, provides that this Financial Impact Statement must address "the estimated increase or decrease in any revenues or costs to state or local governments resulting from the proposed initiative," and section 100.371(5)(c)2., Florida Statutes, requires the Financial Impact Statement to be "clear and unambiguous" and "no more than 75 words in length."

This Court has explained that its "review of financial impact statements is narrow." Water & Land Conservation, 123 So. 3d at 52. This Court only addresses "whether the statement is clear, unambiguous, consists of no more than seventy-five words, and is limited to address the estimated increase or decrease in any revenues or costs to the state or local governments." Land Use Plans, 963 So. 2d at 214.

Here, the Financial Impact Statement complies with the word limit and addresses only the subject of the estimated increase or decrease in revenues and costs to state and local governments. It plainly states that the increased costs

- 43 -

associated with additional regulatory and enforcement activities could not be determined and that fees would offset at least a portion of these increased costs. The Financial Impact Statement also plainly explains that the Financial Impact Estimating Conference could not determine the change in revenue because it could not predict the extent to which medical marijuana would be exempt from taxation. Accordingly, we hold that the Financial Impact Statement complies with section 100.371(5), Florida Statutes. See Advisory Op. to Att'y Gen. re Fla. Growth Mgmt. Initiative Giving Citizens the Right to Decide Local Growth Mgmt. Plan Changes, 2 So. 3d 118, 124 (Fla. 2008) ("Overall, the financial impact statement is necessarily indefinite but not unclear or ambiguous.").

## VI. CONCLUSION

Based on the foregoing, we conclude that the initiative petition and ballot title and summary satisfy the legal requirements of article XI, section 3, of the Florida Constitution, and section 101.161(1), Florida Statutes. In addition, the Financial Impact Statement is in compliance with section 100.371(5), Florida Statutes. We therefore approve the proposed amendment and Financial Impact Statement for placement on the ballot.

It is so ordered.

PARIENTE, LEWIS, QUINCE, and PERRY, JJ., concur.
POLSTON, C.J., dissents with an opinion in which CANADY, J., concurs.
CANADY, J., dissents with an opinion in which POLSTON, C.J., concurs.
LABARGA, J., dissents with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

POLSTON, C.J., dissenting.

I respectfully dissent because placing this initiative's title and summary on the ballot will result in Floridians voting on a constitutional amendment in disguise. The majority fails to acknowledge that the normal and common sense meaning of the words used in this initiative's ballot summary and title are significantly different than the normal and common sense meaning of the words used in the amendment's text. The majority also fails to follow its own prior amendment cases.

Given the plain meaning of the words used, the ballot summary and title mislead voters and do not disclose the true purpose and effect of the amendment's text. See Advisory Op. to the Att'y Gen. re Fairness Initiative Requiring Leg. Determination That Sales Tax Exemptions and Exclusions Serve a Pub. Purpose, 880 So. 2d 630, 635-36 (Fla. 2004) (detailing this Court's review of the validity of a ballot title and summary under section 101.161(1), Florida Statutes). The summary and title "hide the ball" and allow this initiative to "fly under false colors" regarding the severity of medical issues that qualify for marijuana use, a type of deception this Court has previously disallowed and assailed against. See, e.g., Fla. Dep't of State v. Slough, 992 So. 2d 142 (Fla. 2008). Although this Court will not review the substantive merits of this initiative proposal, voters are entitled

- 45 -

to know if they are being asked to open Florida to the expansive use of medical marijuana.

Specifically, the ballot title and summary are affirmatively misleading in four respects: (1) they fail to accurately inform voters that generic "conditions" (not "diseases") qualify for the use of medical marijuana under the amendment's text; (2) they fail to disclose that a person can obtain marijuana under the amendment's text if a doctor simply thinks the benefits of marijuana would likely outweigh the risks; (3) they fail to disclose that the amendment grants broad immunity to physicians, among others; and (4) they falsely imply that the use and possession of marijuana in accordance with this amendment is permissible under federal law. Accordingly, I would disapprove this initiative for placement on the ballot.

### 1. "Condition" versus "Disease"

The ballot summary informs Florida's voters that this amendment "[a]llows the medical use of marijuana for individuals with debilitating diseases as determined by a licensed Florida physician." However, the amendment's text does not actually provide that a physician must determine that an individual suffers from a "disease." Instead, under the amendment's text, an individual only has to have a "condition" in order to qualify for medical marijuana.

The majority faults my discussion of the differences in plain meaning between the term "condition" in the amendment's text and the term "disease" in the ballot summary for not including an in-depth discussion of the word "debilitating." <u>See</u> majority op. at 21-22. This entirely misses the point! As explained in the next section of my dissent, the "debilitating medical condition" language that appears in the amendment's text is specifically defined by that text to include medical issues that could hardly be considered "debilitating" or "enfeebling." <u>Infra</u> at 55. In this section, I focus upon the affirmatively misleading choice of employing the word "disease" in the ballot summary when the word "condition" is what actually is to be given effect in the amendment's text. Moreover, the word "debilitating" is used to modify "disease" in the ballot summary as well as "condition" in the amendment's text. And because "debilitating" modifies both, it could not possibly eradicate any differences in plain meaning between the word "disease" and the word "condition."

It is plainly obvious that the word "condition" is much broader in meaning and much less negative in connotation than the word "disease." For example, the term "condition" can mean "states of health considered normal or healthy but nevertheless posing implications for the provision of health care (e.g., pregnancy)." Phil Sefton, <u>Condition, Disease, Disorder</u>, AMA Style Insider (Nov. 21, 2011), <u>available at</u> http://blog.amamanualofstyle.com/?s=condition+disease+disorder.

"Condition" can also refer to "grades of health," such as "stable, serious, or critical condition." Id.  And, if you look in a medical dictionary, you will discover that the medical profession defines "condition" to mean "to train; to subject to conditioning." Dorland's Illustrated Medical Dictionary 407 (31st ed. 2007); see also Stedman's Medical Dictionary 426 (28th ed. 2006) (defining "condition" to mean "[t]o train; to undergo conditioning," "[a] certain response elicited by a specifiable stimulus or emitted in the presence of certain stimuli with reward of the response during prior occurrence," or "[r]eferring to several classes of learning in the behavioristic branch of psychology.").

Medical dictionaries do not include a definition of illness, injury, or abnormal state of health for the term "condition."  However, the fourth entry for the word in Merriam-Webster's Collegiate Dictionary indicates that "condition" may denote "a usu. defective state of health." Merriam-Webster's Collegiate Dictionary 240 (10th ed. 1994).  Similarly, the Oxford English Dictionary includes "[a] state of health, esp. one which is poor or abnormal; a malady or sickness" as a definition for the word "condition." The Oxford English Dictionary 684 (2d ed. 1989).

In contrast, the term "disease" has a narrower meaning and much more negative connotation.  For example, according to Webster's New World College Dictionary, a "disease" is "a particular destructive process in an organ or organism,

with a specific cause and characteristic symptoms." <u>Webster's New World</u>

<u>College Dictionary</u> 411 (4th ed. 1999). "Disease" is also defined as "a condition of

the living animal or plant body or of one of its parts that impairs normal

functioning and is typically manifested by distinguishing signs and symptoms"

<u>Merriam-Webster's Collegiate Dictionary</u> 358 (11th ed. 2005). And those

affiliated with the medical profession have explained that "disease is perhaps most

often used when referring to a condition that possesses specific characteristics."

<u>Condition, Disease, Disorder</u>, AMA Style Insider, <u>supra</u>. Specifically, Stedman's

Medical Dictionary explains that a "disease" is "[a] morbid entity ordinarily

characterized by two or more of the following criteria: recognized etiologic

agent(s), identifiable group of signs and symptoms, or consistent anatomic

alterations." <u>Stedman's Medical Dictionary</u> 550 (28th ed. 2006); <u>see also</u>

<u>Dorland's Illustrated Medical Dictionary</u> 535 (31st ed. 2007) (defining "disease" to

mean "any deviation from or interruption of the normal structure or function of a

part, organ, or system of the body as manifested by characteristic symptoms and

signs").

Accordingly, Justice Labarga is correct in surmising that, while every

"disease" is by definition a "condition," every "condition" is not a "disease." <u>See</u>

dissenting op. at 81 (Labarga, J.). "Diseases" are only a subset of what is included

in the broader and more value-neutral term "condition." And by employing

"disease" in the ballot summary, rather than the term "condition" that actually appears in the amendment's text, the summary is affirmatively misleading. Contrary to the commonly understood meaning of the words in the summary, an individual could qualify for the use of marijuana under the amendment's text if that individual suffers from a sore back as a result of playing sports or anxiety about an upcoming exam even though that abnormal soreness or anxiety (i.e., "condition") does not rise to the level of a "disease."

The manner in which the summary in this case misleads voters is certainly more egregious than other initiatives that this Court has stricken in the past, including the casino initiative petition that this Court disapproved in Advisory Opinion to the Attorney General re Casino Authorization, Taxation and Regulation, 656 So. 2d 466 (Fla. 1995). There, the ballot summary explained that local governments could authorize casinos at "hotels," but the amendment's text would have allowed local governments to authorize casinos at "transient lodging establishments." Id. at 468. This Court concluded that the difference in language was misleading, explaining that "[w]e believe that the public perceives the term 'hotel' to have a much narrower meaning than the term 'transient lodging establishment.' " Id. at 469. "Thus, while the summary leads the voters to believe that casinos will be operated only in 'hotels,' the proposed amendment actually permits voters to authorize casinos in any number of facilities, including a bed and

breakfast inn." Id.; see also Fla. Dep't of State v. Mangat, 43 So. 3d 642, 648 (Fla. 2010) (invalidating legislatively proposed amendment due to misleading ballot summary and explaining that while the ballot summary's "statement about 'mandates that don't work' might arguably have a relationship to the amendment which is intended to prevent mandated participation in any health care system, neither the amendment nor the summary identifies what mandates are at issue, explains how the mandates do not work, or specifies for whom they do not work").

Not only does the majority of this Court deny that there are commonly understood differences in meaning between "condition" and "disease," it also suggests that, even if there were differences, those differences would not matter because they would pose no legal significance. See majority op. at 33-34. However, the majority is mistaken. Numerous courts have acknowledged the differences in meaning between the terms "condition" and "disease," and those differences have determined the outcomes of cases, particularly in the insurance context. See, e.g., Katskee v. Blue Cross/Blue Shield of Neb., 515 N.W.2d 645, 651-53 (Neb. 1994) (recognizing that not every medical condition is harmful enough to be considered a disease under the plain and ordinary meaning of the term "disease," and explaining that "if the condition is abnormal when tested by a standard of perfection, but so remote in its potential mischief that common speech would not label it a disease or infirmity, such a condition is at most a predisposing

- 51 -

tendency"); Leslie v. J.C. Penney Life Ins. Co., 62 P.3d 1101, 1104 (Idaho 2003) ("[A] condition which is found to be abnormal only when tested by a standard of perfection and with only a remote potential to be a source of physical disturbance is not a 'disease[.]' "); Silverstein v. Metro. Life Ins. Co., 171 N.E. 914 (N.Y. 1930) (same); see also Leland v. Order of United Commercial Travelers of Am., 124 N.E. 517, 520 (Mass. 1919) ("[T]here is no active disease, but merely a frail general condition[.]").  In fact, these legally recognized differences in the plain meaning of "condition" and "disease" are more relevant to our analysis of whether this ballot summary is affirmatively misleading to voters than were the legal differences between "people" and "persons" at issue in Advisory Opinion to the Attorney General re Amendment to Bar Government from Treating People Differently Based on Race in Public Education, 778 So. 2d 888, 897 (Fla. 2000) (invalidating proposed amendment due to misleading ballot summary and explaining that "[w]hile 'people' and 'person[s]' also appear synonymous, their legal differences are significant and are not revealed to the voter").

In addition, contrary to the majority's suggestion otherwise,[1] the misleading use of the word "disease" in the ballot summary is not cured by reading the summary along with the title.  The sponsor chose the title "Use of Marijuana for Certain Medical Conditions," and, as explained above, the summary states that the

---

1. See majority op. at 33.

amendment "[a]llows the medical use of marijuana for individuals with debilitating diseases as determined by a licensed Florida physician." Read together, these phrases would reasonably lead voters to believe that only those certain medical conditions that are determined by a physician to be debilitating diseases would qualify for the use of medical marijuana if the amendment passed. This Court's decision in Slough is directly on point in this regard.

In Slough, 992 So. 2d at 148-49, this Court held that a ballot title and summary were misleading because, when read together, they distinctly implied that the proposed amendment would only apply to school property taxes when in fact it would have applied to other property taxes as well. This Court emphasized in Slough that "the ballot title and summary may not be read in isolation, but must be read together in determining whether the ballot information properly informs the voters." Id. at 148 (quoting Advisory Op. to Att'y Gen. re Fla.'s Amend. to Reduce Class Size, 816 So. 2d 580, 585 (Fla. 2002)). This Court concluded that "[a]lthough the summary does state that proposed Amendment 5 '[l]imit[s] annual increases in assessment of non-homestead real property,' . . . [t]he specific reference to school property taxes in the title would reasonably lead voters to believe that the maximum increases in 'assessment of non-homestead real property' referenced in the summary are limited to school property taxes." Id. Therefore, because "the actual ballot title and summary, when read together, do not

clearly and unambiguously disclose [the] significant and distinct effect of proposed Amendment 5" on non-school assessments, "voters would likely be misled or confused with regard to the actual impact of Amendment 5." Id. at 149.

Similarly, in this case, the inclusion of "certain medical conditions" in the title does not erase the summary's reference to "diseases." When read together, the title and summary are still misleading because they do not clearly and unambiguously disclose to voters that those with "conditions" would qualify for medical marijuana under the amendment's text, not just those with medical issues that rise to the level of "diseases."

## 2.  Benefits Would Likely Outweigh Risks

In addition to deceptively employing the term "disease," the summary and title of this initiative also mislead voters by failing to inform them that all that is required under the amendment's text to qualify for the use of marijuana is for one physician to think that the potential benefits of the drug would likely outweigh the potential risks.

As explained above, the title references "certain medical conditions" and the summary mentions that the amendment would allow access to marijuana for the relief of "debilitating diseases." And while the definition in the amendment's text of what qualifies for medical marijuana as a "Debilitating Medical Condition" includes a specific list of diseases that are clearly "debilitating" (such as cancer,

AIDS, and ALS), it also includes the catchall category of "other conditions for which a physician believes that the medical use of marijuana would likely outweigh the potential health risks for a patient." This catchall category certainly encompasses various medical issues that are less severe and less enfeebling than the "debilitating diseases" described in the title and summary. For example, despite what the title and summary convey to voters, minor aches and pains, stress, insomnia, or fear of an upcoming flight could qualify for the medical use of marijuana under the text of the amendment. This is seriously misleading.

The manner in which the title and summary mislead voters regarding the scope of medical issues that qualify for marijuana is analogous to the casino initiative petition that this Court disapproved in Advisory Opinion to the Attorney General re Casino Authorization, Taxation and Regulation, 656 So. 2d 466. The summary in the casino initiative case stated that local governments could authorize casinos "on riverboats, commercial vessels, [and] at hotels." Id. at 467. However, as this Court explained, the text of the amendment would allow casinos on stationary vessels, including "a casino in a building constructed to look like a riverboat even though the structure is completely landlocked." Id. at 469. Consequently, this Court struck the casino proposal, concluding that "the summary of the proposed amendment [did] not accurately describe the scope of the text." Id.

Furthermore, the title and summary in this case are an example of "wordsmithing," a practice that this Court expressly prohibited in Slough, 992 So. 2d at 149:

> In recent years, advantageous but misleading "wordsmithing" has been employed in the crafting of ballot titles and summaries. Sponsors attempt to use phrases and wording techniques in an attempt to persuade voters to vote in favor of the proposal. When such wording selections render a ballot title and summary deceptive or misleading to voters, the law requires that such proposal be removed from the ballot—regardless of the substantive merit of the proposed changes.

The sponsor here deceptively uses the terms "debilitating diseases" and "certain medical conditions" in the title and summary in an attempt to gain electoral advantage with voters who might object to a broader use of medical marijuana. However, the amendment's text authorizes the medical use of marijuana for more "conditions" and "diseases" than one commonly thinks of as "debilitating." If the sponsor had wished to accurately convey the effect of the amendment's text in an informative and straightforward manner, the sponsor could have titled its amendment "Use of Marijuana for Various Medical Conditions" and employed terminology in the summary similar to "allows medical use of marijuana when licensed physician finds patient benefits would likely outweigh risks." See Slough, 992 So. 2d at 149 ("If a sponsor . . . wishes to guard a proposed amendment from [being stricken due to deceptive wordsmithing] it need only draft a ballot title and summary that is straightforward, direct, accurate and does not fail

to disclose significant effects of the amendment merely because they may not be perceived by some voters as advantageous."); see also Advisory Op. to Att'y Gen. re Ltd. Political Terms in Certain Elective Offices, 592 So. 2d 225, 228 (Fla. 1991) ("A ballot summary may be defective if it omits material facts necessary to make the summary not misleading.").

The majority ignores this deceptive wordsmithing and the expansive use of medical marijuana that would result under the plain meaning of the amendment's text. Instead, the majority warps the ordinary and common sense meaning of the amendment's text through the inappropriate use of statutory construction tools. They do so even though the principle of ejusdem generis that they employ is inappropriate in this case because the meaning of this amendment's text (including its catchall category) is clear and unambiguous. See City of Panama City v. State, 60 So. 2d 658, 660 (Fla. 1952); see also Pottsburg Util. Inc. v. Daugharty, 309 So. 2d 199, 201 (Fla. 1st DCA 1975) ("[Ejusdem generis] is applicable, however, only where there is some inconsistency or ambiguity in the contract and the meaning of the general provision is doubtful and requires clarification. (17A C.J.S. Contracts § 313) Where both the general and special provisions may be given reasonable effect in the context of the contract both provisions must be retained and given whatever meaning the words employed convey."). "Ejusdem generis should only come into play when it is necessary to construe an ambiguous statute, not to create

an ambiguity in a clearly worded statute." State v. Hobbs, 974 So. 2d 1119, 1121 (Fla. 5th DCA 2008).

Specifically, the definition of "Debilitating Medical Condition" that appears in subsection (b)(1) of the amendment's text reads in its entirety as follows:

> "Debilitating Medical Condition" means cancer, glaucoma, positive status for human immunodeficiency virus (HIV), acquired immune deficiency syndrome (AIDS), hepatitis C, amyotrophic lateral sclerosis (ALS), Crohn's disease, Parkinson's disease, multiple sclerosis or other conditions for which a physician believes that the medical use of marijuana would likely outweigh the potential health risks for a patient.

Instead of concluding that this definition includes a list of specific diseases followed by a catchall category of "other conditions for which a physician believes that the medical use of marijuana would likely outweigh the potential health risks for a patient" as its text plainly and expressly says, the majority rewrites the definition. Inappropriately using the principle of ejusdem generis, the majority in effect inserts the word "similar" into the clear and unambiguous definition, thereby transforming the catchall category into something else entirely. After the majority's rewrite, subsection (b)(1) now states "or other similar conditions for which a physician believes that the medical use of marijuana would likely outweigh the potential health risks for a patient." The majority's revision is entirely inappropriate under our precedent. See generally Mangat, 43 So. 3d at 650 ("This Court does not have the authority to substitute the language that three-fifths

- 58 -

of the members of the Legislature have voted to place on the ballot."). To be clear, I do not disagree with the canon of ejusdem generis itself as the majority incorrectly asserts. See majority op. at 26. Rather, I disagree with the majority's decision to apply the canon in this particular case because the meaning of the amendment's text (including its catchall category) is very clear and unambiguous.

Additionally, while the majority correctly mentions that the amendment's subsections must be read together as a whole, it fails to do so. The majority points to subsection (b)(9), which defines "Physician certification" to mean "a written document signed by a physician, stating that in the physician's professional opinion, the patient suffers from a debilitating medical condition, that the potential benefits of the medical use of marijuana would likely outweigh the health risks for the patient, and for how long the physician recommends the medical use of marijuana." And the majority insists that based upon subsection (b)(9) a physician must not only conclude that the potential benefits outweigh the risks, but that the patient also has a "debilitating medical condition." See majority op. at 27-28. However, the majority ignores that "debilitating medical condition" is a specifically defined term under the amendment's text. In fact, as just mentioned above, subsection (b)(1) has already defined "Debilitating Medical Condition" to mean "other conditions for which a physician believes that the medical use of marijuana would likely outweigh the potential health risks for a patient."

Therefore, by reading subsections (b)(1) and (b)(9) together, it is abundantly (and redundantly) clear that a physician need only believe that the potential benefits of marijuana would likely outweigh the risks for the individual. There is no additional "debilitating" medical condition or "debilitating" disease that must be present to qualify for marijuana.

The majority claims that this interpretation renders "meaningless the first part of subsection (b)(9), which states that the physician must determine that 'the patient suffers from a debilitating medical condition.' " Majority op. at 28. To the contrary, it is the majority's interpretation that renders meaningless an entire subsection of the amendment's text, specifically subsection (b)(1) which actually defines what the amendment's text means when it states "debilitating medical condition" in the first part of subsection (b)(9) and everywhere else. Why include a specific definition of a term that is used repeatedly in the amendment's text if the sponsor of the amendment did not intend for that term to mean what the definition says it means?

The majority also mentions other parts of the amendment's text that it claims are "restrictions [that] reflect a constitutional scheme that is meant to be limited in scope regarding the medical use of marijuana." Majority op. at 29. In particular, the majority notes subsection (b)(9)'s explanation that "[a] physician certification may only be provided after the physician has conducted a physical examination of

the patient and a full assessment of the patient's medical history." But an exam and a medical history are hardly "restrictions" limiting the ability of a physician to recommend marijuana for medical issues that are not commonly viewed as severe or debilitating. In fact, these requirements are in place every time someone receives an antibiotics prescription for a mild, non-debilitating infection. Accordingly, contrary to the majority's suggestion otherwise, the title and summary mislead voters regarding the scope of medical issues that qualify for medical marijuana under the plain meaning of the amendment's text.

### 3. Immunity

Additionally, the title and summary of this initiative proposal mislead voters by failing to disclose the broad immunity that would be granted if this amendment is adopted, immunity that conflicts with and restricts Floridians' current constitutional right of access to courts. Cf. Advisory Op. to the Att'y Gen. re Fla. Growth Mgmt. Initiative Giving Citizens the Right to Decide Local Growth Mgmt. Plan Changes, 2 So. 3d 118, 123 (Fla. 2008) ("Because the Smarter Growth amendment will not conflict with or restrict any existing rights to subject local growth management plans to local referenda, the lack of detail concerning the petition process does not render the title and summary misleading.").

While the title and summary omit any mention of immunity from civil liability, criminal liability, and sanctions under Florida law, the first section of the amendment's text reads as follows:

(a) PUBLIC POLICY.

(1) The medical use of marijuana by a qualifying patient or personal caregiver is not subject to criminal or civil liability or sanctions under Florida law except as provided in this section.

(2) A physician licensed in Florida shall not be subject to criminal or civil liability or sanctions under Florida law for issuing a physician certification to a person diagnosed with a debilitating medical condition in a manner consistent with this section.

(3) Actions and conduct by a medical marijuana treatment center registered with the Department, or its employees, as permitted by this section and in compliance with Department regulations, shall not be subject to criminal or civil liability or sanctions under Florida law except as provided in this section.

Based on the plain meaning of this text, physicians, caregivers, patients, marijuana treatment centers, and treatment center employees will be granted broad immunity relating to their participation in the medical use of marijuana if this amendment passes.

The majority completely ignores the broad immunity that subsection (a) provides to caregivers, patients, treatment centers, and treatment center employees. And while the majority acknowledges that subsection (a) discusses immunity for physicians, it completely misconstrues the plain language of the text to the point of making it meaningless.

Specifically, the majority claims that "it is a reasonable construction that physicians are granted immunity only to the extent that they prescribe marijuana 'consistent with this section.' " Majority op. at 38. Thus, the majority concludes that "the proposed amendment does not protect physicians who fraudulently or negligently prescribe medical marijuana, does not change the professional duties and obligations of licensed Florida physicians, and does not restrict Florida's current constitutional right of access to the courts." Id. However, the majority fails to acknowledge that a physician could recommend marijuana for a patient "in a manner consistent with this section" but that recommendation could still be a form of medical malpractice. For example, a physician, in his misguided "professional opinion," could believe that the benefits of marijuana for a teething toddler would likely outweigh the risks and, therefore, recommend that the toddler use marijuana three times a day for six months or until the teething subsided. Indeed, this physician could have reached this determination and recommendation after conducting a "physical examination" of the toddler and after "a full assessment of the patient's medical history," which would mean the recommendation would be made "in a manner consistent with this section." Of course, such a recommendation may fall outside "the prevailing professional standard of care for that health care provider." § 766.102(1), Fla. Stat. (2013). And the victims of this medical malpractice would have no legal recourse due to

the civil immunity provided to physicians by subsection (a) of the amendment's text. The text of the amendment fails to include a requirement of adhering to the prevailing professional standard of care and instead provides immunity for whatever "professional opinion" the physician exercises, even if it is a negligent one.

Because any mention of immunity is omitted from the ballot title and summary, voters would be unaware that their valuable right to pursue medical malpractice claims (as well as other tort claims) associated with medical marijuana will be lost if this amendment passes. And, to be clear, this valuable right is currently guaranteed by article I, section 21 of Florida's Constitution, which provides that "[t]he courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay."

This Court has invalidated prior proposed amendments based upon less significant omissions in ballot language with respect to the amendment's effect on other constitutional provisions than the one at issue here. See, e.g., Advisory Op. to the Att'y Gen. re 1.35% Prop. Tax Cap, Unless Voter Approved, 2 So. 3d 968, 976 (Fla. 2009) ("[W]e find the ballot summary misleading because it does not inform the voter of the repeal of an existing Florida constitutional provision [providing] for the millages that can be assessed by the various local government units[.]"); Fla. Dep't of State v. Fla. State Conference of NAACP Branches, 43 So.

3d 662, 668 (Fla. 2010) (invalidating an amendment proposed by the Legislature and explaining that "the ballot language did not inform the voters that the amendment would allow the existing mandatory constitutional requirement in article III, section 16(a), requiring that districts be contiguous to be subordinated to the discretionary standards" for redistricting outlined in the proposed amendment).

Accordingly, based upon our precedent, this initiative's ballot language is fatally misleading because it fails to disclose the amendment's significant effect on Floridians' constitutional right of access to courts, including the right to pursue medical malpractice claims against physicians who negligently recommend marijuana in a manner consistent with the amendment's text. See also Bar Gov't from Treating People Differently Based on Race in Pub. Educ., 778 So. 2d at 895 ("[C]ourts will be closed, not open, to victims of discrimination who seek redress for their injuries. Thus, the proposed amendments have a substantial effect on article I, section 21, and the failure to identify this substantial effect violates the single-subject requirement.").

### 4. Federal Law

Finally, the summary misleads Florida's voters by falsely implying that the use and possession of marijuana in accordance with this amendment would be lawful, including under federal law.

The summary states the following: "Applies only to Florida law. Does not authorize violations of federal law or any non-medical use, possession or production of marijuana." When read together with the entire ballot summary and title, these statements imply that qualifying patients may lawfully use and possess marijuana if the amendment passes. However, this is absolutely false. Whether or not this amendment passes, the medical use of marijuana will remain a federal crime.

In fact, any manufacture, distribution, or possession of marijuana is a criminal offense under federal law. See Gonzales v. Raich, 545 U.S. 1, 14 (2005). The federal Controlled Substances Act (CSA) "designates marijuana as contraband for any purpose; in fact, by characterizing marijuana as a Schedule I drug, Congress expressly found that the drug has no acceptable medical uses." Id. at 27. Moreover, in 2005, the United States Supreme Court expressly held that Congress has the power to prohibit the local, intrastate cultivation and use of marijuana under the CSA even though such cultivation and use complied with a state's medical marijuana law. Id. at 29.

Therefore, despite what the summary falsely implies to voters, Floridians can still be prosecuted for the medical use of marijuana even if such use is in accordance with this amendment. See City of Riverside v. Inland Empire Patients Health and Wellness Ctr., Inc., 300 P.3d 494, 497 (Cal. 2013) (explaining that

California's medical marijuana laws "have no effect on the federal enforceability of the CSA in California. The CSA's prohibitions on the possession, distribution, or manufacture of marijuana remain fully enforceable in this jurisdiction."); United States v. Stacy, 734 F. Supp. 2d 1074, 1084 (S.D. Cal. 2010) (explaining that defendant's compliance with California's medical marijuana laws did not grant him immunity under federal law and that, in his federal prosecution, defendant could not present the defense that he was cultivating marijuana in compliance with state law and that he had a good faith belief it was lawful). And while ballot summaries are not required to mention the current state of federal law or a proposed state constitutional amendment's effect on federal law, they are required to not affirmatively mislead Florida voters by falsely implying the opposite of what that current state of federal law is.

## 5. Conclusion

To summarize, the title and summary at issue in this case are affirmatively misleading because they obscure the breadth of medical issues that would qualify for medical marijuana by deceptively employing the term "disease" and by failing to disclose that a physician need only believe that the benefits would likely outweigh the risks. Additionally, the title and summary are affirmatively misleading because they fail to disclose the broad immunity that would be granted if the amendment passes and because they falsely imply that the use and possession

of marijuana in accordance with the amendment would not violate federal law. As a result, the ballot title and summary omit significant details that would enable a voter to make an informed decision regarding the merits of the amendment.

Therefore, I would disapprove the proposal for placement on the ballot, and I respectfully dissent.

CANADY, J., concurs.


CANADY, J., dissenting.

I agree with Chief Justice Polston and Justice Labarga that the proposed amendment should be denied placement on the ballot because the ballot summary is clearly and conclusively misleading. One of the most important rights enjoyed by the people of Florida under our constitution is the right to vote on constitutional amendments proposed through the initiative process. That right and the initiative process are subverted when the voters are presented a misleading ballot summary. The integrity of the electoral process is seriously compromised by placing this proposed amendment on the ballot with a radically defective summary—a summary that will affirmatively mislead the voters in several different ways concerning the chief purpose of the amendment. I dissent.

I.

Most egregiously, the ballot summary seriously misrepresents the interaction of the proposed amendment with federal law. The problem here is not with what the summary omits but with what it contains. The summary states that the proposed amendment "[d]oes not authorize violations of federal law," but the truth is that violations of federal law unquestionably are authorized by the amendment. A more misleading characterization of the relationship between the amendment and federal law is hard to conceive.

The majority's attempt to address this issue blithely sidesteps the basic deception in this portion of the summary. First, the majority states that "the statements in the ballot summary are substantially similar in meaning to the proposed amendment's text." Majority op. at 40. A comparison of the text of the summary with the text of the amendment gives the lie to this assertion. Second, the majority states that we have "never required that a ballot summary inform voters as to the current state of federal law and the impact of a proposed state constitutional amendment on federal statutory law as it exists at this moment in time." Id. at 42. That assertion may be true, but it is totally beside the point. The issue here is not that the summary fails to explain the amendment's relationship with federal law but that it affirmatively misrepresents that relationship.

This is what the text of the amendment says about federal law: "Nothing in this law section [sic] requires the violation of federal law or purports to give

immunity under federal law." (Emphasis added.) And this is what the summary says about federal law: "Applies only to Florida law. Does not authorize violations of federal law. . . ." (Emphasis added.) Contrary to the majority's assertion, it is obvious that the text of the summary is strikingly dissimilar to the text of the amendment.

The text of the amendment says that nothing in the amendment "requires the violation of federal law," but the text of the summary says that the amendment "[d]oes not authorize violations of federal law." There is a vast difference between not requiring a violation of federal law—whatever that may mean—and not authorizing a violation of federal law. To find substantial similarity here is to find something that does not exist. The text of the amendment also says that the amendment does not "purport[] to give immunity under federal law," but the summary says nothing about "immunity." Once again, there is a salient lack of similarity between the amendment and the summary.

The problem with this aspect of the summary, however, goes beyond these dissimilarities. The fundamental problem is that the summary is blatantly deceptive because it informs the voters that the amendment "[d]oes not authorize violations of federal law," although it is beyond dispute—as Chief Justice Polston's dissent explains—that conduct authorized by the amendment is criminal conduct under federal law. The voters therefore are potentially hoodwinked into

- 70 -

believing that the amendment is consistent with the requirements of federal law. The summary's proclamation of the amendment's supposed consistency with federal law is not about some inconsequential, ancillary detail that would be unlikely to influence a reasonable voter's evaluation of the proposed amendment. On the contrary, it is a circumstance to which many voters may attach considerable significance. By misleading the voters on this significant point, the summary corrupts the electoral process.

The sponsors of the proposed amendment argue that the language of the summary is accurate because it "explicitly places the voter[s] on notice that they should be aware that the proposed initiative does not authorize violation of federal marijuana laws." Initial Brief of Sponsor at 41, <u>Advisory Op. to the Att'y Gen. re Use of Marijuana for Certain Med. Conditions</u>, SC13-2006 (Fla. Nov. 8, 2013). They also argue that the summary places "voters on notice that any change provided by this amendment affects only Florida law, and that federal laws are unaffected by this change." <u>Id.</u> at 44. The first argument is nonsensical. The second argument is correct, but it dodges the real issue.

By the first argument, the sponsors apparently mean to suggest that the summary informs voters that liability for violations of federal law will not be affected by the amendment. That is not inaccurate as a description of the portion of the summary that states: "Applies only to Florida law." A reasonable reader

would understand from this statement that the amendment would not alter or preempt federal law. If that were the only language in the summary bearing on the relationship between the proposed amendment and federal law, there would be no problem. The deception comes in the language that immediately follows, which informs the voters that the amendment "[d]oes not authorize violations of federal law."

The sponsors suggest that this language is equivalent to the immediately preceding language in the summary. The suggestion that the two distinct statements communicate the same information crumbles under scrutiny. The question immediately arises why in the summary—where the seventy-five-word limitation places a premium on economy of expression—a statement would be included that simply restated in different words what had already been stated. A reasonable reader of the summary would hardly expect that the summary would repeat itself.

But, of course, the summary does not repeat itself. The statement that the amendment "[d]oes not authorize violations of federal law" carries a meaning that is entirely different from the preceding statement that the amendment "[a]pplies only to Florida law." The attempt to equate the two statements does violence to the plain meaning of the terms. A reasonable reader can only conclude that the second of the two statements occurring in the summary affirms that the conduct

authorized by the amendment is not conduct that would violate federal law.  That is what it says.  If the statement in the summary had paralleled the statement in the text of the amendment that nothing in the amendment "purports to give immunity under federal law," there would have been no deception, and the voters would have indeed been placed on notice that conduct authorized by the amendment might run afoul of federal law.  The sponsors, however, chose not to include the statement tracking the text of the amendment.  Instead, they chose—for some inexplicable reason—the deceptive statement.

## II.

The remaining defects in the ballot summary largely revolve around the failure of the summary accurately to reflect the amendment's chief purpose, which is to authorize physicians to prescribe the medical use of marijuana when the "physician <u>believes</u> that the medical use of marijuana would likely outweigh the potential health risks for a patient."  (Emphasis added.)  This crucial language of the amendment—which appears in the definition of "Debilitating Medical Condition" in subsection (b)(1)—establishes a subjective standard for the medical use of marijuana, a standard granting physicians the authority to authorize the use of marijuana if the physician "believes" that the use by a particular patient would be medically beneficial given the medical condition from which the patient suffers. In particular, this language in the text of the amendment is relevant to the

- 73 -

misleading statement in the summary that the amendment "[a]llows the medical use of marijuana for individuals with debilitating diseases as determined by a licensed Florida physician." It is also relevant to the summary's failure to disclose the broad nature of the immunity from civil liability granted to physicians by the text of the amendment, an immunity that is inextricably tied to the chief purpose of the amendment.

With respect to the immunity from liability granted by subsection (a)(2) of the amendment, analysis must begin with the acknowledgment that a standard predicated on what a particular physician "believes"—a word denoting a subjective determination—is not equivalent to the prevailing medical standard of care. It is significant that the word "believes" in subsection (b)(1) is unqualified by the word "reasonably." And nothing in the text or the context of the amendment suggests that "reasonably" should be read into the text. As a consequence, a physician who "believes that the medical use of marijuana would likely outweigh the potential health risks for a patient" and who issues a physician certification reflecting that subjective belief, has issued a physician certification "in a manner consistent with" the amendment. Under subsection (a)(2), the physician therefore "shall not be subject to . . . civil liability or sanctions under Florida law for issuing" the physician certification.

The unmistakable import of the immunity provision is that such a physician cannot be held liable for negligence in connection with the issuance of the physician certification. The voters have a right to know that their right to pursue negligence claims in these circumstances is barred by the amendment's immunity provision. But the summary omits any mention of this immunity.

Finally, I turn to the majority's attempt to justify the misleading reference to "debilitating diseases" in the ballot summary. In that attempt, the majority incorrectly relies on the ejusdem generis—"like kind"—canon. Consideration of the structure and full context of the amendment's central definition in light of the rationale for the canon leads to the conclusion that the canon is not properly applied here.

The canon "means that 'where an enumeration of specific things is followed by some more general word or phrase, such general word or phrase will usually be construed to refer to things of the same kind or species as those specifically enumerated.' " Arnold v. Shumpert, 217 So. 2d 116, 119 (Fla. 1968) (quoting Children's Bootery v. Sutker, 107 So. 345, 347 (Fla. 1926)). The canon "rests on [a] practical insight[] about everyday language usage" which recognizes that "[w]hen people list a number of particulars and add a general reference . . . they mean to include by use of the general reference not everything else [within the scope of the general reference] but only others of like kind [with the listed

particulars]." 2A Norman J. Singer & J.D. Shambie Singer, <u>Sutherland Statutory Construction</u> § 47:18, at 382 (7th ed. 2007).

A necessary condition for the application of the canon is that the "members of the enumeration suggest a class." <u>Id.</u> at 380.  That is to say, there must be something that makes the enumerated particulars of "like kind" with one another.  "Without some objective relationship" among the members of the enumeration, identifying a class for purposes of applying the canon will necessarily be "arbitrary and meaningless." <u>Id.</u> at 382.  Accordingly, to properly apply the canon, some naturally understood common quality or characteristic among all the specific members of the enumeration must exist.  If that condition obtains, the specific common quality or characteristic ordinarily will naturally be understood to limit the sweep of the general reference following the enumeration to a subcategory of the general reference.  Otherwise, there is no basis for restricting the sweep of the general reference.

Here, the enumerated particulars in the definition do not "suggest a class" that can reasonably be understood to limit the sweep of the general provision to some subcategory.  These are the particulars enumerated in the definition: "cancer, glaucoma, positive status for human immunodeficiency virus (HIV), acquired immune deficiency syndrome (AIDS), hepatitis C, amyotrophic lateral sclerosis (ALS), Crohn's disease, Parkinson's disease, multiple sclerosis."  This list

represents a diverse group of medical conditions, ranging from the inevitably and devastatingly debilitating and fatal to conditions that frequently can be successfully treated and controlled or cured. The list does not suggest a subcategory of the general category of "other conditions for which a physician believes that the medical use of marijuana would likely outweigh the potential health risks for a patient."

This is a consequence not only of the diverse nature of the specifically enumerated medical conditions but also of the special nature of the general reference, which focuses on what a physician subjectively "believes" about the medical benefit for a particular patient given the particular medical condition from which the patient suffers. Based on this structural feature of the general reference, it is more natural to understand the listed medical conditions as illustrative of conditions that physicians will likely "believe" warrant the medical use of marijuana than to understand the listed conditions as establishing a limitation on the scope of the physician's authority. The general thus controls the specific. The standard is whether the patient suffers from a medical condition—listed or unlisted—"for which [the] physician believes that the medical use of marijuana would likely outweigh the potential health risks for [the] patient."

The majority unconvincingly asserts that an ancillary administrative provision of the amendment—subsection (b)(9)—relating to the content of

physician certifications, should be allowed to alter the meaning of the definition that is the very heart of the proposed amendment. Contrary to the majority's assertion, subsection (b)(9) does not require that the key phrase of the definition in subsection (b)(1)—which refers to "other conditions for which a physician believes that the medical use of marijuana would likely outweigh the potential health risks for a patient"—be effectively read out of the definition. Instead, the dual requirements of subsection (b)(9) that the physician certification include the statement that "the patient suffers from a debilitating medical condition" and the statement "that the potential benefits of the medical use of marijuana would likely outweigh the health risks for the patient," are entirely consistent with the understanding that the general phrase in the definition controls the specifically enumerated conditions. Subsection (b)(9) simply requires the physician to state the conclusion that the patient is eligible as a patient with a "debilitating medical condition" and to state the basis for that conclusion—namely, that the benefits of the medical use of marijuana outweigh the risks for the particular patient.

In maintaining that only debilitating diseases are within the scope of the subsection (b)(1) definition, the majority is determinedly oblivious to the fact that "debilitating medical condition" is a specifically defined term and that neither the term "debilitating" nor the term "disease" appears in the operative language of the definition. The majority is also determinedly oblivious to the fact that "medical

- 78 -

condition" is a broader, more inclusive term than "diseases." By reading "debilitating diseases" into the operative language of the definitions set forth in subsection (b)(1), the majority gives the definition a meaning that the text of the definition does not admit. As a result, the majority turns a blind eye to the misleading reference to "debilitating diseases" in the ballot summary, a reference that cannot be squared with the text of the amendment, which allows physicians to authorize the use of medical marijuana not only for patients suffering from a debilitating disease but for any patient suffering from a condition "for which [the] physician believes that the medical use of marijuana would likely outweigh the potential health risks for [the] patient."

## III.

Foisting this seriously deceptive ballot summary on the voters does a severe disservice to the people and to their constitution. The proposed amendment should not be placed on the ballot. The sponsors of this amendment should be given an opportunity to pursue their objective with a new proposal that has a ballot summary that does not mislead the voters.

POLSTON, C.J., concurs.


LABARGA, J., dissenting.

I dissent because I conclude that the ballot title and ballot summary are fatally confusing in regard to the conditions or diseases which may be treated by the use of medical marijuana. When determining the validity of initiative petitions such as this, the Court's inquiry is limited to whether the petition satisfies the constitutional single-subject requirement and the requirement of section 101.161(1), Florida Statutes (2013). See Advisory Op. to Att'y Gen. re Amend. to Bar Gov't from Treating People Differently Based on Race in Pub. Educ., 778 So. 2d 888, 890-91 (Fla. 2000). Section 101.161(1) requires that that ballot title and summary state "in clear and unambiguous language the chief purpose of the measure." Advisory Op. to Att'y Gen.—Limited Political Terms in Certain Elective Offices, 592 So. 2d 225, 228 (Fla. 1991).

We have noted that "voters are generally required to do their homework and educate themselves about the details of a proposal and about the pros and cons of adopting the proposal." Smith v. Am. Airlines, Inc., 606 So. 2d 618, 621 (Fla. 1992). However, no amount of voter homework would disclose exactly what conditions or diseases may be treated with medical marijuana under this ballot title and summary. As we reiterated in Armstrong v. Harris, 773 So. 2d 7 (Fla. 2000), "[t]he problem, therefore, lies not with what the summary says, but rather with what it does not say." Id. at 15 (quoting Askew v. Firestone, 421 So. 2d 151, 156 (Fla. 1982)).

While the ballot title suggests that medical marijuana may be prescribed only for "certain medical conditions," the ballot summary states that the use is allowed for "debilitating diseases as determined by a licensed Florida physician." At this point, the voter will not know if the category of "medical conditions" for which use of medical marijuana is allowed is smaller or larger than the category of "debilitating diseases" for which physicians may prescribe medical marijuana. Further confusing the matter for the voter is the fact that the text of the amendment defines "debilitating medical condition" with a list of specifically named diseases followed by a catchall phrase, "other conditions for which a physician believes that the medical use of marijuana would likely outweigh the potential health risks for a patient." Is the term "condition" limited to what may be characterized as a "disease"? Or may a debilitating medical condition be a condition not caused by disease? While "disease" may be defined by use of the term "condition," it is not so clear that "condition" is in turn defined by use of the term "disease" or is synonymous with it. The confusion inherent in the use of these terms, even when read together, gives me great concern that the voter will not be fairly and clearly apprised of the proposal's chief purpose.

"Fair notice in terms of a ballot summary must be actual notice consisting of a clear and unambiguous explanation of the measure's chief purpose." Askew, 421 So. 2d at 156. In my view, even the informed voters who have done their

homework and read the complete ballot title, ballot summary, and ballot text will not be clearly informed of what limits, if any, are placed on the use of medical marijuana. Nor will the voter know the scope of "certain medical conditions" or "debilitating diseases" for which the use of marijuana may be allowed.

This Court has been assiduous in the past in scrutinizing ballot titles and summaries to assure that they fairly inform the voters of the substance and effect of proposed amendments. Although the Court is reluctant to remove proposed amendments from a vote of the public, this Court has not been reluctant to strike a summary that fails to clearly and fully inform the voter of the significant effects of the amendment. As we held in Smith, "we are required by section 101.161 [Florida Statutes] to ensure that the ballot summary clearly communicates what the electorate is being asked to vote upon. This ballot summary fails to do so." Smith, 606 So. 2d at 621.

I do recognize that the limited range of the ballot summary "prevents [it] from revealing all the details or ramifications of the proposed amendment." Smith, 606 So. 2d at 621. Even so, the summary must clearly state the amendment's chief purpose.[2] In this case, the chief purpose of the proposed amendment is

_____

2. Section 101.161(1), Fla. Stat. (2013), provides that the ballot summary for a constitutional amendment proposed by citizen initiative "shall be an explanatory statement, not exceeding 75 words in length, of the chief purpose of the measure." Given the complexity of issues often raised in amendments proposed by citizen initiative, the Legislature should consider expanding that limit

- 82 -

inextricably tied to the circumstances under which medical marijuana may be prescribed. That is exactly the area of the ballot title and summary that are not clear. For these reasons, I dissent from the majority's approval of the ballot title and summary and the placement of this proposed amendment on the ballot.

Two Cases:
Original Proceeding – Advisory Opinion – Attorney General

Pamela Jo Bondi, Attorney General, and Gerry Hammond, Senior Assistant Attorney General, Tallahassee, Florida; Allen Winsor, Solicitor General, and Rachel E. Nordby and Leah A. Sevi, Deputy Solicitors General, Tallahassee, Florida,

　　　for Petitioner,

Jon L. Mills of Boies Schiller & Flexner, LLP, Miami, Florida, Timothy McLendon, Gainesville, Florida, and John Morgan, Orlando, Florida,

　　　for People United for Medical Marijuana, Sponsor

George T. Levesque, General Counsel, Tallahassee, Florida, on behalf of The Florida Senate and Don Gaetz, in his official capacity as President of the Florida Senate; and Daniel E. Nordby, General Counsel, on behalf of The Florida House of

---

or providing some mechanism for redrafting the amendment, where practicable, to provide the clarity necessary for placement on the ballot. The Legislature provided a similar corrective mechanism for legislatively proposed constitutional amendments where the ballot statement proposed by legislative joint resolution is found to be defective. Section 101.161, Florida Statutes, was amended in 2011 to provide in subsection (3) that if the court finds the Legislature's ballot statement to be defective, the Attorney General may prepare and submit a revised ballot statement, unless otherwise provided in the joint resolution. See § 101.161(3)(b)2., Fla. Stat. (2011). I urge the Legislature to consider extending a similar corrective mechanism to constitutional amendments proposed by citizen initiative.

Representatives and Will Weatherford, in his official capacity as Speaker of the Florida House of Representatives; Susan L. Kelsey of Kelsey Appellate Law Firm, P.A., Tallahassee, Florida, and Kenneth B. Bell of Clark, Partington, Hart, Larry, Bond & Stackhouse, Pensacola, Florida, on behalf of Florida Chambers of Commerce, Florida Medical Association, Florida Police Chiefs Association, Florida Sheriffs Association, and Save Our Society from Drugs,

      as Opponents

Rupert E. Dunkum, Webster, Florida,

      Responding with comments